COX, J.
*148 J & L Oil Company filed suit against defendants, KM Oil Company, LLC, Haymary, Inc., Big M Oil Company, and Feist Properties, LLC (collectively referred to as "Defendants") for impinging upon J & L's oil, gas, and mineral lease (hereinafter referred to as "OGML"). Both J & L and Defendants filed motions for summary judgment. In a written ruling, the district court denied J & L's motion for summary judgment and granted Defendants' motion for summary judgment. J & L appeals the granting of Defendants' motion for summary judgment. For the following reasons, we affirm.
FACTS
This suit arises out of the production of oil from a tract of land (hereinafter referred to as the "Feist Land") located in Section 25, Township 21 North, Range 15 West, Caddo Parish, LA, comprising 55 acres, more or less, more particularly described as follows:
The South Half of the Northwest Quarter (S/2 of NW/4), less the West 825 Feet thereof, Section Twenty-Five (25), Township Twenty-One (21) North, Range Fifteen (15) West, Caddo Parish, Louisiana.
The following instruments establish the parties' interests in the Feist Land:
*149 A. OGML (hereinafter referred to as the "1951 Lease") Eunice W. Feist, et al (Lessors) Executed 11/19/1951 Imperial Agency Corp. (Lessees) Recorded 1/28/1952 "[T]his lease ... shall give the Lessors no rights to strata lying below Twenty-Five Hundred (2500) Feet mean Gulf level, all rights below that level are being retained by Lessor[.]" B. Assignment of OGML Imperial Production Co. (Assignor) Effective 1/1/1966[1] Miriam Ann Trahan (Assignee) Recorded 1/3/1966 Document shows an assignment of interest in the 1951 Lease. C. Assignment of OGML Miriam Ann Trahan, et al[2] (Assignor) Executed 6/7/1999 Jimmy Courtney, et al[3] (Assignees) Recorded 7/20/1999 Document shows an assignment of interest in the 1951 Lease. D. OGML[4] Feist Properties, LLC (Lessor) Executed 5/27/2008 KM Oil Company, LLC (Lessee) Recorded 5/28/2008 "[T]his lease covers the right to explore and produce ... minerals only from the interval located between a depth of 2,500 feet below the surface of the earth and a depth of 3,500 feet below the surface of the earth, called the "Leased Interval[.]" E. Assignment of OGML KM Oil Company, LLC (Assignor) Executed 5/28/2008 Haymary, Inc. (Assignee) Recorded 5/28/2008 Document shows an assignment of 2/3 interest in the 2008 OGML. F. Extension OGML Feist Properties, LLC (Lessor) Executed 5/25/2009 KM Oil Company, LLC (Lessee) Recorded 6/5/2009 Document extends the term of the 2008 lease and amends the allowable depths. "[I]t is agreed that the Leased Interval shall be amended from 2,500-3,500 feet to 2,000-3,500 below the surface of the earth." * * *
[Editor's Note: The preceding image contains the references for footnotes[1] ,[2] ,[3] ,[4] *150 ].
This suit is dependent upon the wording of Article 6 in the 1951 Lease,[5] which provides, in pertinent part:
The consideration of this lease is the unconditional obligation of Lessee to commence the actual drilling of a well on some portion of the leased premises on or before January 1, 1952... to a total depth of at least 1700 feet[.] Failure to comply strictly with this obligation shall ipso facto terminate this lease[.]
Thereafter this lease may be kept in full force and effect only by continuous drilling, by which is meant the beginning of a second well within Thirty (30) days after completion or abandonment of the first well, and beginning of a third like well within Thirty (30) days after the completion or abandonment of the second well, and beginning of a fourth like well within Thirty (30) days after completion or abandonment of the third well, and the beginning of a fifth like well within Thirty (30) days after the completion or abandonment of the fourth well-so that lessee shall drill and complete diligently five (5) wells within the time limits fixed herein.
[I]t being agreed and understood that the failure to drill any successive well (after the first well is completed or abandoned) within the prescribed time for the commencement of that successive well under the continuous drilling schedule set forth in the preceding paragraph shall ipso facto terminate, cancel and forfeit this lease, and Lessee shall have no right to resume drilling, and all its rights in this lease shall cease; provided, however, that if five (5) wells are timely drilled within the allotted time for each well, and all are completed as commercial producers, then all of the land leased shall be bound by this lease as long as all of the five (5) wells remain producers in paying quantities. But if less than five (5) wells are timely drilled, or five (5) wells are timely drilled and one or more cease to produce in paying quantities, then in either event any such well completed and remaining a producer in paying quantities is to hold only five (5) acres in a square with the well in the center thereof so long as said well produces in paying quantities. Any well which fails to produce in paying quantities shall not have the effect of holding any portion of this lease in force as to any of the acreage described.
J & L, KM, and Haymary each assert the ability to produce oil between the depths of 2,000-2,500 feet on the Feist Land.
Five wells were drilled by Imperial on the Feist Land within the time limits stipulated in the 1951 lease. According to Exhibit F submitted by Defendants, J & L drilled a total of 11 wells from 1/16/1952 through 7/15/1967. The same exhibit states that on the Feist Land in 2015, J & L
*151 allegedly produced three barrels of oil for the months of February and March, one barrel for the month of April, and three barrels for the month of May. However, as per Defendants' Exhibit F, there has not been a disposition of oil since January of 2015, when 77 barrels of oil were sold. The exhibit does not state which party or company sold the oil.
Defendants' Exhibit F further stated the following information was found in Lease Facility Inspection Reports at the Louisiana Office of Conservation:
1. The Feist No. 006 well had a report dated June 26, 2015. The well sign was mis-located and the Well No. 5 sign was on the Well No. 6. There was also a reported oil spill by the landowner, and a minor spill was observed from a flow line leak of approximately 2.5 barrels of oil. The operator has restored the surface.
2. There is another Lease Facility Inspection Report covering the Feist No. 004 well dated 8/26/2014. This well seems to be P&A as there was no well at the well site location.
3. Lease Facility Inspection Report No. 45177 dated July 30, 2014, concerns the Feist 003 Well. This well shows to be producing as a status 10, but it is not producing.
KM & Haymary drilled two wells to depths near 3,000 feet under the 2008 Lease. There was no mineral production from either well. KM then requested Feist Properties amend the lease to include depths of 2,000-2,500 feet. Two wells, Feist A No. 2 and Feist A No. 3, were ultimately perforated between 2,200 and 2,500 feet. Both of these wells produced in paying quantities.
Defendants' Exhibit H is a plat showing the J & L wells and KM wells. A five-acre square is drawn around the J & L wells. The square around J & L well Feist No. 3 encompasses the KM well Feist A No. 3. The square around J & L well Feist No. 4, which is noted as plugged and abandoned, encompasses the KM well Feist A No. 1, which is also noted plugged and abandoned, and the KM well Feist A No. 2.
Big M Oil Company served as the operators for the KM wells and produced oil from the Feist Land during 2010-2011, resulting in working interest payments totaling $261,397.03, paid to KM and Haymary.
J & L filed a petition to nullify the lease and for damages on July 6, 2011. J & L filed a motion for summary judgment on November 4, 2016, requesting the 2008 Lease and 2009 Extension be nullified to the extent it covers 2,000-2,500 feet below the surface of the earth.
In their motion for summary judgment, J & L submitted an affidavit from Jerry Don Courtney, who stated he has assisted in the pumping of the oil wells on the Feist Land, gauging of the stock tanks, and communicating with buyers since the 1970s. His affidavit further stated there has been continuous oil production from the wells located on the Feist Land, which have been operated by J & L and its predecessors to the 1951 Lease.
Defendants filed their motion for summary judgment on November 3, 2016, accompanied by an affidavit from James R. McCormick. The affidavit stated Imperial drilled five wells, but not all came on as, or remained, commercial producers. It further stated the KM Feist A No. 2 and KM Feist A No. 3 wells are within the five-acre squares surrounding the J & L No. 3 and No. 4 wells. The affidavit states the J & L No. 3 well does not have electricity connected to the well, has neither a treating hose nor a treating pot, the riser wire is not connected, and there is no fluid in the flow line. It states the J & L No. 4 well is *152 classified as plugged and abandoned and contains no surface equipment.
J & L filed an opposition memorandum to Defendants' motion for summary judgment on January 17, 2017. J & L stated that the "so-called 'Pugh' clause would have been triggered prior to the drilling of the Feist # 6 well in 1966. However, eight more wells were drilled in 1966 and 1967, without complaint by the Lessors." J & L stated that Malcolm Feist and Carroll Feist signed an OGML in 1977 and acknowledged that the 1951 Lease remained "a producing mineral lease." J & L argued this 1977 OGML signed by Malcolm Feist and Carroll Feist supports the plaintiff's version of the reading of the 1951 Lease.
J & L suggested the parties' intent was that any five producing wells would maintain the lease. "[T]he Plaintiffs aver that as long as five (5) wells are producing in paying quantities, then the entire 55 acre tract, down to a depth of 2,500 feet, remains held by production." J & L further stated that at all times pertinent, there were at least five wells producing on the 1951 Lease.
J & L then objected to the McCormick affidavit and the well history submitted by Defendants. It stated McCormick had no actual knowledge of the facts and relied on his research at the Louisiana Office of Conservation. It argued there was nothing to suggest the research by McCormick was reliable because he had not been deemed an expert. J & L found the list of wells submitted by Defendants to be inaccurate because it listed wells drilled by another operator prior to the 1951 Lease and did not correctly identify J & L well No. 3 or well No. 4.
In an affidavit attached to J & L's opposition memorandum, Courtney stated the electric line to the Feist No. 3 well was torn down by equipment operated by Defendants. This affidavit, although similar to the first Courtney affidavit, had additional language, which stated, "the wells known as Feist # 1, # 2, # 3, # 4, # 5, # 6, # 7, # 8, # 9, # 10, # 11, # 12, and # 13 were continuing to produce oil in the 1970's when he became familiar with operations of the Feist lease."
Defendants filed a memorandum in opposition to J & L's motion for summary judgment on January 20, 2017. Defendants pointed out that J & L did not comply with Louisiana District Court Rule 9.10 because it did not include a list of the essential legal elements or a list of material facts it contends are undisputed. Defendants stated this was a fatal procedural error that precludes the court's granting of J & L's motion. Defendants argued that if J & L's interpretation of the lease was correct, the last sentence in Article 6 of the 1951 Lease would be meaningless.[6] Defendants argued this interpretation was in violation of La. C. C. arts. 2049 and 2050.
On January 25, 2017, Defendants filed a reply to J & L's opposition to Defendants' motion for summary judgment. They disagreed with J & L's interpretation of Article 6 of the 1951 Lease as "any" five wells remaining in production will hold the entire lease. Defendants noted the resolutory condition is not expressed as "if enough wells cease to produce so that the remaining productive wells is a number less than five." They argued the 1951 Lease is not ambiguous. Defendants reiterated their point that J & L did not comply with Louisiana District Court Rule 9.10. They also stated McCormick's affidavit *153 was that of a fact witness, so no expert designation was necessary.
On March 3, 2017, Defendants filed a supplemental memorandum in support of their motion for summary judgment, referencing with greater specificity the documents which prove each fact. New evidence was not referenced.
On March 6, 2017, J & L filed a supplemental motion in support of its motion for summary judgment, in accordance with the requirements of Louisiana District Court Rules. It referenced the documents that proved each fact with greater specificity. J & L asserted Defendants had actual knowledge of the ongoing production on the Feist Land because Haymary received and disposed of salt water gathered by J & L from its wells on the Feist Land. J & L argued this prior knowledge is an indication of bad faith on the part of Defendants.
On March 9, 2017, the district court issued its written ruling on the motions for summary judgment. The district court denied J & L's motion and granted Defendants' motion. The court stated, "The dispute at the heart of these cross-motions for summary judgment is whether the plaintiff satisfied the drilling and production requirements of the Pugh clause in the plaintiff's lease."
The district court found the only evidence presented by J & L that the Pugh clause was satisfied, was the affidavit of Jerry Don Courtney. The district court stated:
Courtney's affidavit is insufficient to constitute prima facie proof of the plaintiff's satisfaction of the Pugh clause. It is silent as to the number of wells drilled by the plaintiff, the times at which any such wells were drilled, and whether any such wells remained producers in paying quantities constantly up to the time the defendant's lease was executed and/or the defendant's wells were drilled.
...
Accordingly, the defendants' MSJ, which asserts that the plaintiffs failed to maintain the lease through satisfaction of the Pugh clause, must be granted.
J & L has appealed the district court's ruling on the motions for summary judgment.
DISCUSSION
I. Pugh clause in the Imperial Lease
In its first assignment of error, J & L argues the district court erred in finding that the Pugh clause in the Imperial Lease was not satisfied. J & L states, as it did previously, that the Pugh clause in the 1951 lease was satisfied. It objects to the well history compiled by the defendants because it believes it to be hearsay and unreliable due to the incorrect listing of wells. J & L relies on the Courtney affidavit to satisfy that there has been continuous, on-going oil production from the wells located on the Feist Land. It argues the affidavit evidences that each of the five initial wells was producing into the 1970s. It also points out the acknowledgment by Carroll Feist and Malcolm Feist in the 1977 OGML that the 1951 Lease remained a "producing mineral lease."
J & L states that once it has shown that the requisite five wells were drilled, the court must decide how the 1951 Pugh clause will function and when it will begin to function. J & L argues that because there are multiple interpretations of how the Pugh clause will operate, there is a need for a full interpretation of the terms of the 1951 Lease.[7]
*154 A de novo standard of review is required when an appellate court considers rulings on motions for summary judgment, and the appellate court uses the same criteria that governed the district court's determination of whether summary judgment was appropriate. Creek Mgmt., L.L.C. v. Unopened Succession & Unknown Heirs or Legatees of Williams , 51,392 (La. App. 2 Cir. 5/17/17), 223 So.3d 1194, writ denied , 2017-1252 (La. 10/27/17), 228 So.3d 1222. A motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3).
The burden of proof on a summary judgment motion remains with the movant. However, if the moving party will not bear the burden of proof on the issue at trial and points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense, then the nonmoving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the opponent of the motion fails to do so, there is no genuine issue of material fact and summary judgment should be granted. La. C.C.P. art. 966(D)(1).
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. When a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit. Id. , comment (b); Maloney v. Oak Builders , 256 La. 85, 235 So.2d 386 (1970). Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050.
A conditional obligation is one dependent on an uncertain event. If the obligation may be immediately enforced but will come to an end when the uncertain event occurs, the condition is resolutory. La. C.C. art. 1767. Conditions may be either expressed in a stipulation or implied by the law, the nature of the contract, or the intent of the parties. La. C.C. art. 1768.
The heart of the dispute is whether J & L satisfied the 1951 Pugh clause. To prevail on a motion for summary judgment, J & L would have to introduce prima facie evidence that it satisfied the requirements of the 1951 Pugh clause, making the entire 55 acres held by production.
We find the language of Article 6 in the 1951 Lease to be clear and unambiguous. As stated in La. C.C. art. 2046, there is no need to pursue the intent of the parties.
It is clear the first well had to be drilled by January 1, 1952. Each subsequent well had to be drilled within 30 days of the completion or abandonment of the previous well. The lessee must drill five wells within the time limits given. If the five wells were drilled within the time limits, and if all were completed as commercial producers, and as long as all five wells remained producers in paying quantities, then all the land would be held by the *155 lease. However, if any of the five wells were not drilled within the time limits or any did not continue to produce in paying quantities, then the only land held by the lease would be a 5-acre square around each producing well. Any well not producing in paying quantities would not hold any portion of the lease.
Article 6 operates as a resolutory condition. When any of the five wells failed to produce in paying quantities, the resolutory condition was triggered, reducing the lease to 5-acre squares around the producing wells.
J & L's evidence consisted of two affidavits from Mr. Courtney, who had been involved in the operation of the wells on the Feist Land since the 1970s. Mr. Courtney stated 13 wells were continuing to produce in the 1970s. J & L did not give the dates the wells were drilled, nor did it produce evidence that the five required wells had constantly produced in paying quantities since being drilled in 1951 and/or 1952. The 1977 OGML from Carroll Feist and Malcolm Feist, noting the 1951 Lease was in effect, is also insufficient proof that all the required wells had constantly produced in paying quantities since being drilled.
We find this assignment of error to be without merit.
II. Genuine Issue of Material Fact
In its second assignment of error, J & L argues the district court erred in finding that no genuine issue of material fact existed. J & L's position is that there is a genuine issue of material fact supported by the record. It lists the following examples as evidence that the 1951 Lease was held by production:
1. The November 4, 2016 and January 16, 2017 Affidavits of Jerry Don Courtney;
2. The July 27, 1977 OGML executed by Carroll W. Feist, et al. which acknowledges that the 1951 Lease remained "a producing mineral lease" and instructs the lessee not to interfere with the works of the 1951 Lease.
3. The defendants acknowledged the requisite five wells were drilled.
4. James McCormick acknowledged current production from the 1951 Lease on the Feist Land because his company disposed of the salt water resulting from the J & L wells.
Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3). A fact is "material" when its existence or nonexistence may be essential to the plaintiff's cause of action under the applicable theory of recovery. Facts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute. Barfield v. Diamond Constr. Inc. , 51,291 (La. App. 2 Cir. 4/5/17), 217 So.3d 1211, writ denied , 2017-0751 (La. 9/15/17), 228 So.3d 1205. An issue is genuine if reasonable persons could disagree based on the evidence presented. Justiss Oil Co., Inc. v. Monroe Air Ctr., L.L.C. , 45,356 (La. App. 2 Cir. 8/11/10), 46 So.3d 725.
As stated previously, J & L bears the burden of proving its cause of action. In this case, the proof of satisfaction of the Pugh clause is necessary for the cause of action. J & L did not prove the existence of a material fact-that the required wells had been constantly producing since 1951. This fact is essential to determining the outcome of the dispute because the KM wells are impinging on the 1951 Lease only *156 if the wells have constantly produced since 1951.
The two Courtney affidavits and the 1977 OGML do not show a genuine issue. These documents do not show constant well production since 1951.
The defendants' burden was to point out to the court the absence of factual support for J & L's claim that production from the 1951 Lease held the entire Feist Land. The defendants pointed to a lack of factual support for the requirement of continuous production of the five wells since 1951. Defendants met that burden with information from the Louisiana Department of Conservation well logs and the McCormick affidavit. Defendants further showed J & L's Feist No. 3 and No. 4 wells are no longer producing in order to hold a 5-acre square around each well.
Accordingly, we find this assignment of error lacks merit.
CONCLUSION
By not showing continuous production from the 1951 Lease, J & L did not prove a genuine issue of material fact existed. Therefore, Defendants were entitled to judgment as a matter of law. For these reasons, we affirm the district court's grant of Defendants' motion for summary judgment. Costs of appeal are assessed to Appellant, J & L Oil Company.
AFFIRMED.

This assignment was executed on 12/29/1965, but effective as of 7:00 am on 1/1/1966.

Miriam Ann Trahan conveyed a portion of her interest to R.A. Baur in 1966. The other assignors on the 1999 assignment have the name Baur. For simplicity, the additional documents have not been listed above, although they are filed in the record.

Jimmy Courtney and Loyce Courtney, DBA J & L Oil Co. After Jimmy Courtney died, Loyce and the other heirs assigned the Feist lease to J & L, effective 10/31/2008. For simplicity, the additional documents have not been listed above, although they are filed in the record.

KM did not perform a title search in the conveyance records of Caddo Parish before obtaining the 2008 Lease or the 2009 Extension.

Although this OGML provision was written before the Pugh clause was created by attorney Lawrence G. Pugh, Sr., both parties have referenced Article 6 by calling it a Pugh clause. References to the Pugh clause are understood to be referencing this provision of the 1951 Lease.

The last sentence of Article 6 reads, "Any well which fails to produce in paying quantities shall not have the effect of holding any portion of this lease in force as to any of the acreage described."

J & L outlines the following possibilities as illustration:
1. When any one of the initial five wells is a dry hole or stops producing in paying quantities; or
2. When only four or less wells are producing on the whole lease;
3. If the clause begins to function when any single well ceases to produce, then do the remaining wells producing at the same time continue to be a portion of the leased premises (in a snap-shot of the condition of the lease production at that time); or do the five acre areas independently fail (one-by-one) when a producing well ceases in that particular five acre area.